## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

|  |  |  |
|---|---|---|
| LEON CLAIR, B78251,<br>JORDAN BAILEY, Y31943,<br>BLAKE WILSON, M49014, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) ) | Case No. 25-cv-82-DWD |
| CHAPLAIN LAMBERT-GOHEEN,<br>GALLOWAY,<br>JOHN/JANE DOES 1-6,<br>CARL W. HARMON,<br>HILLIE,<br>BRADFORD,<br>ANTHONY B. JONES,<br>CRANE,<br>JOSHUA A SCHOENBECK,<br>ANTHONY WILLS,<br>TRAVIS BALYER,<br>ROB JEFFREYS, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## <u>MEMORANDUM AND ORDER</u>

**DUGAN, District Judge:**

This matter is before the Court on the Complaint filed jointly by Leon Clair, Jordan Bailey, and Blake Wilson, all inmates of the Illinois Department of Corrections (IDOC) who resided at Menard Correctional Center (Menard) when this complaint was filed. The Plaintiffs allege that since from the third quarter of 2022 through January of 2023 they experienced hinderances with their ability to observe their religion at Shawnee Correctional Center (Shawnee). They claim that after a gathering for a Jumu'ah service in Shawnee's chapel on January 20, 2023, they became the targets of retaliatory transfers

to Menard, and retaliatory discipline.  Plaintiff Clair also alleges that during the transfer restraints were used in a fashion known to cause him extreme pain, and defendants refused to help him or to provide care for injuries he sustained.

On January 23, 2025, the Court entered a *Boriboune*[1] Order  (Doc. 6) to inform Plaintiffs of the risks and benefits of proceeding together with group litigation.  Each Plaintiff was required to advise the Court in writing on or before February 13, 2025, whether he wanted to continue as a plaintiff in this group action.  (*Id.*).  Plaintiffs Bailey and Wilson were also informed of the need to sign the Complaint, and they were mailed copies of the Complaint so that they could easily review it and returned a signed pleading.  Wilson explicitly notified the Court that he wanted to proceed (Doc. 7), but he was subsequently transferred to Lawrence (Docs. 12-15).  Wilson has not yet submitted a signed pleading, nor has he submitted an application to proceed IFP.  Bailey has submitted a Motion (Doc. 10) to supplement his own litigation history, and a Motion to Proceed IFP (Doc. 11).  The Court takes these documents to mean that he wants to proceed, but Bailey has not submitted a signed complaint.  Plaintiff Clair signed the initial complaint (Doc. 1), so he did not need to submit an additional document to proceed.  Although the co-plaintiffs have clearly made efforts to comply with the *Boriboune* Order, for reasons discussed later in this Order, the Court finds that at this time it will be most efficient to sever each Plaintiff into his own lawsuit.

---

[1] *See Boriboune v. Berge*, 391 F.3d 852 (7th Cir. 2004) (instructing district courts to warn individuals involved in multi-plaintiff litigation of the pros and cons of proceeding together in a single action and allow them an early opportunity to opt out of group litigation).

The Complaint is now before the Court for preliminary review under 28 U.S.C. § 1915A, which requires the Court to screen prisoner complaints and filter out nonmeritorious claims. 28 U.S.C. § 1915A(a). The Court is required to dismiss any portion of the Complaint that is legally frivolous or malicious, fails to state a claim for relief, or seeks money damages from a defendant who is immune from relief. 28 U.S.C. § 1915A(b). At this juncture, the factual allegations in the pro se Complaint are liberally construed. Rodriguez v. Plymouth Ambulance Serv., 577 F.3d 816, 821 (7th Cir. 2009).

## The Complaint

The Plaintiffs designated Claims 1-8 in their own pleading. The Court will discuss the factual allegations using this structure but will ultimately designate a few additional claims to improve clarity. In Claim 1, Plaintiffs allege that in the third quarter of 2022 when religious services in IDOC returned to a more normal level after the Covid-19 pandemic, the Al-Islam followers were not afforded the same opportunities to observe their religion as other groups. Previously, the group had weekly hour-long Taleem and Jumu'ah services, but after the pandemic, they were limited just to the Jumu'ah services. They claim that Lambert-Goheen allowed other religious groups to go back to full operations, and that she assisted other groups in things like recruiting outside volunteers to come in to deliver religious messages. They also allege that Defendant Lambert-Goheen ensured that other religions received appropriate meals for their religious dietary needs during special holidays, but she made sure to be out of the office or otherwise failed to supervise dietary services for special occasions such as Ramadan or Eid-Al-Fitr. They

claim Defendant Galloway knew of this from multiple missives but failed to do anything about it and thus participated in the discriminatory treatment. (Doc. 1 at 13).

In Claim 2, Plaintiffs allege that Jumu'ah services were subject to such stringent restrictions that the services were essentially rendered ineffective as a form of observing the religion. While other religions had outside volunteers that came to the prison to lead worship, the Al-Islam members were not allowed an outside volunteer. On many occasions, this meant that the Al-Islam inmates were left with a short 15–20-minute video for Jumu'ah, while other religions enjoyed an hour-long service. On a handful of occasions, Lambert-Goheen allowed Plaintiff and another inmate to consult on the contents of longer Jumu'ah gatherings, and they were allowed to deliver pre-approved and strictly scripted messages themselves. However, Lambert-Goheen hindered this effort by attempting to insist that Plaintiff Clair and a fellow-inmate needed to recruit other followers of the religion to deliver Jumu'ah messages so that fellow inmates would not come to regard the two as religious leaders. The two tried to explain that this would not be religiously appropriate because teachings should only be delivered by those highly knowledgeable in the Quran, but Lambert-Goheen remained steadfast. In mid-January of 2023, she promised to allow Plaintiff Clair to deliver the service, but she swapped it out for the 20-minute video at the last minute. Plaintiff faults Lambert-Goheen and Defendant Warden Galloway for making these policies, and John Doe 1 (the Warden of Programs) from maintaining and carrying out these policies. (Doc. 1 at 16).

In Claim 3, Clair alleges that on January 20, 2023, he and fellow inmates went to the chapel expecting to participate in a Jumu'ah service that he was to lead by delivering

a pre-approved speech. The speech had been delayed the previous week without warning, and the Jumu'ah gathering on this day was delayed because Lambert-Goheen took time to escort a volunteer religious leader for another religion out of the prison. While the inmates were waiting, they discussed filing grievances about the unfair treatment of their religion. When Lambert-Goheen arrived, she prepared the television for a video and indicated to the inmates that she would be playing a video instead of having Clair speak because she could not allow one inmate to become a leader of others. Prior to playing the video, she initiated a Q&A session, as was typical. Many hands were raised, and she indicated they would proceed as long as everyone maintained proper manners and decorum. Individuals asked a variety of questions about why Clair could not always lead services, or why they could not get an outside volunteer Imam to lead services, which Lambert-Goheen largely brushed off. When individuals began to press about names of those in the Administration responsible for religious decisions so that they could file grievances, the tone changed. Lambert-Goheen threatened to cancel the services entirely. Clair then raised his hand and asked if she would really cancel services simply because they were asking calm and valid questions about their services. Rather than responding, Lambert-Goheen gave a single order for everyone to get out of the chapel and she immediately began to collect prayer rugs.

Plaintiff alleges that the inmates exited in an orderly fashion. On the way out, he overheard an inmate worker raising his voice and verbalizing his opinion to Lambert-Goheen, who told him to lower his tone. Plaintiff mentioned to another nearby individual that he should file a grievance and lawsuit, to which Lambert-Goheen said,

"right!" (Doc. 1 at 19). Inmates returned to their cells, and later that afternoon an officer came to Clair's cell and told him to pack his property to move to restrictive housing. Clair alleges he was never given an investigative ticket, nor was he told directly why he was put in restrictive housing. He was told in passing by an officer that a number of inmates were taken to restrictive housing after talking about filing grievances against Lambert-Goheen, but Clair did not genuinely believe this could be the situation as grievance activity is permissible. Clair alleges he eventually realized that all of the individuals taken to restrictive housing were those who had previously filed grievances against Lambert-Goheen and who had been seen on camera speaking to him. He was placed in restrictive housing on a Friday, and he alleges that by the following Tuesday all inmates implicated had been transferred to other facilities.

Clair and co-plaintiffs Bailey and Wilson were all transferred to Menard, a maximum-security facility. At Menard they each received an identical disciplinary ticket that charged them with disobeying direct orders essential to safety and security, or a lesser offense of insolence. (Doc. 1 at 20). The tickets were premised on information from confidential sources, and alleged they had disrupted services on January 20, 2023, and had been aggressive with the chaplain. Clair alleges that the disciplinary ticket and use of confidential informants was intentional because Lambert-Goheen is "very calculated" in her actions. He alleges the discipline was retaliatory. Clair faults Defendants Jeffreys (former director of IDOC) and Warden Galloway for quickly signing off on inmate transfers without doing an investigation. He further alleges Jeffreys, Galloway, Lambert-Goheen, John Doe 2 (shift supervisor who signed the disciplinary report), Major Hillie,

Lt. Bradford, and Carl Harmon all violated the plaintiffs' rights to due process and punished them for attempting to exercise their religion.  (Doc. 1 at 21).

In Claim 4, Plaintiff Clair alleges that on January 24, 2023, John Doe 3, a "transit" lieutenant at Shawnee applied handcuffs in a manner that was too tight and caused extreme pain.  He alleges that upon arrival at Menard, he was re-cuffed tightly behind his back to a stool.  The handcuffs dug deep into his wrists, almost immediately caused his entire arms to go numb, and caused bleeding.  He informed Defendants Jones, and John Does 4-6 that he was in extreme pain, but none of them intervened and he was left in excruciating pain for at least an hour.  When the handcuffs were removed, an officer remarked that he was bleeding.  He sought medical care for 10 days, and faults John Doe 7 (the nurse who processes sick call requests) for delaying treatment for his lacerations.  He also alleges that Defendant Crane (a nurse practitioner at Menard) delayed him access to care for his wrists and/or delayed his access to needed medical permits related to handcuffs for a year after his arrival at Menard.  (Doc. 1 at 23).

In Claim 5, Plaintiff Clair alleges that he received a disciplinary report for three offenses on January 25, 2023.  He completed the slip to request witnesses and also noted he wanted camera footage from the chapel to be reviewed.  Bailey and Wilson allege they also requested witnesses and video footage.  A hearing was held for Clair on February 1, 2023, at which time he was asked if he needed a continuance to get statements from his witnesses.  Defendant Schoenbeck insisted he did not, and then Clair proceeded to give a verbal account of events, which he claims Schoenbeck heavily interrupted.  Clair spoke on the nature of the offenses alleged, as well as his own account of what transpired at the

Shawnee chapel.  Clair was ultimately found guilty and received a month of C-grade and

28 days of segregation.  He claims that co-plaintiffs Wilson and Bailey's hearings went

similarly, despite other individuals who faced the same disciplinary report having their

offenses expunged.  Plaintiff Clair tried to grieve the disciplinary outcome via two

channels, and Defendants Bayler and Jeffreys refused to investigate further, however, he

alleges that they did direct Warden Wills to downgrade one of the charges to a lesser

offense.  He claims that based on these events his Due Process rights were violated by

Defendants Schoenbeck, Jones, Wills, Bayler and Jeffreys.

Clair alleges that all named defendants worked together to enact atypical and

significant conditions on him by allowing his transfer from Shawnee to Menard.  He

claims it is a harsher environment with little out of cell time, programming or vocational

opportunities, or other amenities.  (Doc. 1 at 26).  He further alleges co-plaintiffs Bailey

and Wilson lost a chance at acquiring good time credit.  (Doc. 1 at 26-27).

Finally, plaintiffs allege in Claim 7 that the State of Illinois is required to indemnify

all named defendants and to pay any judgment entered against them.  And in Claim 8,

Plaintiff Clair argues that Defendants Jones and John Does 3-6 failed to intervene when

they refused to adjust his restraints during or after his transfer from Shawnee to Menard.

(Doc. 1 at 27-28).

The Plaintiffs seek compensatory and punitive damages.  (Doc. 1 at 29).  They have

attached grievances and related documents pursued by Mr. Clair, disciplinary reports for

all three plaintiffs that allege verbatim supporting facts (Doc. 1 at 43-48), and an

Adjustment Committee Summary for Mr. Clair demonstrating that he was found guilty

of all charged offenses and received a month of C-grade and 28 days of segregation (Doc. 1 at 49-50).  An attached memorandum from the Menard Records Office to Mr. Clair indicated that on April 19, 2023, one of his disciplinary offenses was reduced upon recommendation from the Administrative Review Board, and as approved by the Director's Office.  (Doc. 1 at 55).

The complaint is organized into 8 enumerated claims.  (Doc. 1).  The Court largely adopted this designation, but it reorganized some of the claims to better match legal theories, and it renumbered some of the claims for clarity.  Based on the allegations in the Complaint, the Court will designate the following claims:

**Claim 1:**    **Equal Protection claim against Defendants Lambert-Goheen and Warden Galloway for affording Al-Islam observers a single 20–30-minute Jumu'ah service once a week and for completely discontinuing Taleem weekly educational gatherings, while other religions were afforded hour-long gatherings from late-2022 onward;**

**Claim 2:**    **Equal protection claim against Defendant Lambert-Goheen for failing to ensure adequate dietary accommodations for Ramadan, Eid-Al-Fitr, and Eid-Al-Adha, despite ensuring adequate dietary accommodations for religious holidays of other religions such as Christmas or Passover.**

**Claim 3:**    **First Amendment claim against Defendants Lambert-Goheen, Warden Galloway, and John Doe 1 (Shawnee Assistant Warden of Programs) for strictly limiting the content of the Khutbah (sermon/speech) in late-December of 2022-January of 2023, and/or for replacing the Khutbah with short video presentations;**

**Claim 4:**    **First Amendment retaliatory transfer claim against Defendants Warden Galloway and Director Jeffreys for allegedly quickly signing off on immediate transfers after the January 20, 2023, chapel incident allegedly without conducting any investigation;**

| | |
|---|---|
| **Claim 5:** | **First Amendment retaliatory discipline claim against Defendants Lambert-Goheen, C/O Harmon (officer who reported the January 20, 2023, incident for discipline), John Doe 2 (supervisor who signed off on the disciplinary report), Hillie, and Bradford for "acting in cohesion" to retaliate against Plaintiffs for using the grievance process regarding Al-Islam religious practice;** |
| **Claim 6:** | **Fourteenth Amendment Due Process claim against Defendants Wills, Schoenbeck and Jones for approving the identical disciplinary reports against all Plaintiffs without investigating the underlying events;** |
| **Claim 7:** | **State law indemnification claim concerning the acts of all Defendants;** |
| **Claim 8:** | **Eighth Amendment excessive force or cruel and unusual punishment claim against Defendants John Doe 3 (transit officer), Jones, and John Does 4-6 for using restraints in a fashion that caused unnecessary pain and lacerations to Plaintiff Clair's wrists on January 24, 2023, and/or for failing to provide relief or medical care for the injuries sustained;** |
| **Claim 9:** | **Eighth Amendment failure to intervene claim against John Does 3-6 for failing to adjust Plaintiff Clair's restraints on January 24, 2023, once notified that they were causing extreme pain;** |
| **Claim 10:** | **Eighth Amendment deliberate indifference claim against Defendant Crane for delaying or denying Plaintiff Clair access to adequate medical care for wrist injuries or to a proper handcuff permit for a year after his arrival at Menard.** |

The parties and the Court will use these designations in all future pleadings and orders unless otherwise directed by a judicial officer of this Court. Any claim that is mentioned in the Complaint but not addressed in this Order is considered dismissed without prejudice as inadequately pled under *Twombly*. *See Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 570 (2007) (an action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim that is plausible on its face").

### Preliminary Dismissals

The Plaintiffs named Travis Bayler as a defendant in the case caption. The sole mention of Bayler is made in the context of Plaintiff Clair's discussion of his efforts to exhaust a grievance about his disciplinary ticket. Clair faults Bayler for "falsely" rejecting one of his grievances as previously addressed by the Administrative Review Board. (Doc. 1 at 25). Clair also faults Bayler and Jeffreys for allegedly refusing to independently review his grievance, and for depriving him of due process. These allegations are insufficient to state a claim against Bayler or Jeffreys because a mere role in processing grievances is insufficient to make out a claim even if an official makes a mistake on the grievance. *See e.g., Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) (the alleged mishandling of a grievance by an official who did not otherwise cause or participate in an underlying event does not state a claim). To the extent the Plaintiffs also intended to maintain a due process claim against Jeffreys and Bayler, they cannot maintain such a claim for the same reasons explained in the discussion below of Claim 6.

Plaintiff Clair named Jane Doe 7 in the factual allegations of the complaint and described her as a nurse who was responsible for processing sick call slips in the days after his January 24, 2023, transfer to Menard when he had cuts on his wrists from the handcuffs. He faults Jane Doe 7 for delaying his access to timely care. However, he has not named Jane Doe 7 in the caption of the case, so she is not currently a proper defendant in this action. Federal Rule of Civil Procedure 10 requires that a case caption contain the

name of each party.  Thus, the allegations against Jane Doe 7 are dismissed without prejudice because she was not properly named.

**Analysis**

**Claims 1 and 2**

The Equal Protection Clause and the Establishment Clause prohibit the defendant from treating members of some religious faiths more favorably than others without a secular reason. *See Cruz v. Beto*, 405 U.S. 319, 322-23 (1972); *Nelson v. Miller*, 570 F.3d 868, 880-82 (7th Cir. 2009); *Kaufman v. McCaughtry*, 419 F.3d 678, 683-84 (7th Cir. 2005). "The rights of inmates belonging to minority or non-traditional religions must be respected to the same degree as the rights of those belonging to larger and more traditional denominations." *Al-Alamin v. Gramley*, 926 F.2d 680, 686 (7th Cir. 1991).  To state an equal protection claim, a plaintiff must allege that he was treated differently from others based on membership in a suspect class (such as race, gender, alien status, or national origin) or based upon the denial of a fundamental right (freedom of speech or religion). *See, e.g., Srail v. Village of Lisle, Ill.*, 588 F.3d 940, 943 (7th Cir. 2009).

Here, the Plaintiffs have alleged that observers of the Al-Islam religion had reduced weekly services from late 2022 onward at Shawnee (1 Jumu'ah service per week, and no Taleem), and that their services were often shorter than others (just 20-30 minutes, instead of a full hour).  This is sufficient at this preliminary juncture to state a claim.  They fault Defendant Lambert-Goheen for directly controlling the Jumu'ah services.  Claim 1 may proceed against Lambert-Goheen on the assertion she intentionally differentiated between Al-Islam and other religions when scheduling and facilitating services.

The also allege that Warden Galloway should be held responsible for the unequal treatment that he was made aware of from numerous "missives." This allegation is insufficiently detailed. While a prison administrator can be held responsible for an issue if he or she has been repeatedly notified of a problem by highly detailed correspondence, and fails to investigate, the allegations do not rise to that level in this case. Plaintiffs ambiguously allege they send repeated "missives" to Galloway about this problem, but they do not indicate when these were sent, which Plaintiffs of the three sent them, what the correspondence stated, or what response (if any) they received. The threadbare assertion that Galloway knew of an issue with religious services from an unquantified amount of correspondence is insufficient to state a claim. Moreover, there is no supervisory liability under § 1983, so Galloway cannot be held liable simply for supervising Lambert-Goheen. As such, Claim 1 may proceed against Lambert-Goheen, but not Galloway.

Additionally, the Plaintiffs allege that their religious dietary needs were not met during holidays (Ramadan, Eid-Al-Fitr, and Eid-Al-Abah), while the religious dietary needs of other groups were met. They fault Lambert-Goheen for intentionally being away from the prison during their holidays and/or for failing to supervise the dietary department's fulfillment of religious meals for Al-Islam observers. Claim 2 is sufficient against Lambert-Goheen for her personal role.

## Claim 3

Plaintiffs allege that in additional to being treated differently than other inmates, the restrictions on their Jumu'ah and Taleem services burdened their ability to fully

observe their religion. Specifically, they describe the manner in which Lambert-Goheen regulated speeches and speakers as problematic. They explain that on a few occasions in late 2022 she allowed inmates to deliver pre-approved speeches, but then she became concerned that Plaintiff Clair's repeated delivery of the speeches could make him into a "leader" of fellow inmates, which is not allowed in IDOC. She encouraged Clair and a fellow inmate to recruit other inmates to deliver speeches. They explained that alternative speakers were hard to find, and that it strained the religion to consider alternative speakers because those who speak at Jumu'ah are supposed to have an expert grasp of religious tenets and the ability to speak in English and Arabic. At this point, Lambert-Goheen transitioned to showing short 20-minute videos instead of allowing speakers. She promised that in early January of 2023 Clair would be allowed to lead another service, but when the time came she changed the plans twice with no advance notice. They fault Lambert-Goheen for her personal role, and allege Galloway also participated in these limitations, and that John Doe 1 (the assistant warden of programs who supervised Lambert-Goheen) was responsible for implementing these limits.

The First Amendment prohibits prison officials from imposing a substantial burden on the free exercise of religion unless the burden is reasonably related to a legitimate penological interest. *See Kaufman v. Pugh*, 733 F.3d 692, 696 (7th Cir. 2013). "A substantial burden puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Thompson v. Holm*, 809 F.3d 376, 379 (7th Cir. 2016). "[A]n inmate is not entitled to follow every aspect of his religion; the prison may restrict the inmate's practices if its legitimate penological interests outweigh the prisoner's religious

interests." *Kaufman v. McCaughtry*, 419 F.3d 678, 683 (7th Cir. 2005). Thus, even a substantial burden is permitted if the burden is "reasonably related to legitimate penological objectives." *Vinning-El v. Evans*, 657 F.3d 591, 592−93 (7th Cir. 2011) (citing *Turner v. Safley*, 482 U.S. 78, 89−91 (1987)). "Courts consider four factors when evaluating a prison policy against a First Amendment claim: (1) whether the policy rationally relates to a legitimate governmental objective; (2) whether the inmate has an alternative means of exercising the right; (3) the impact that accommodating the right will have on security; and (4) whether ready alternatives exist to the prison's policy." *Larry v. Goldsmith*, 799 F. App'x 413, 415 (7th Cir. 2020); *see Turner*, 482 U.S. at 89−91 (outlining similar factors).

At this preliminary juncture, the allegations are sufficient to make out a claim against Lambert-Goheen for substantially burdening the plaintiffs' religious exercise by cancelling Taleem and severely restricting Jumu'ah services. Ultimately this claim will turn on a careful factual analysis of the restrictions and the available alternatives. The Court notes it also considered the Religious Land Use and Institutionalized Persons Act (RLUIPA) as a potential legal theory, but determined this would not be a successful theory as RLUIPA offers only injunctive relief and the Plaintiffs are no longer at Shawnee.

As for Defendants Galloway and John Doe 1, the allegations are insufficiently detailed to demonstrate their personal involvement in substantially burdening the religion. The most Plaintiffs have is the vague assertion that there were policies at play or that Lambert-Goheen was acting consistent with what the prison administration wanted, but these assertions are too vague to establish personal involvement by

Galloway or John Doe 1.  Thus, Claim 3 may proceed against Lambert-Goheen, but not Galloway or John Doe 1.

Claim 4

The Plaintiffs allege that an incident arose in the chapel on January 20, 2023, when Lambert-Goheen had promised to allow Plaintiff Clair to deliver a pre-approved speech, but then changed plans last minute to instead show a short video.  During what the Plaintiffs describe as a cordial question and answer session, inmates in attendance for the service questions Lambert-Goheen's reasons for the last-minute change and explained to her the importance of an outside volunteer Imam or speeches from Clair.  During the exchange Lambert-Goheen eventually became visibly frustrated and threatened to cancel all services.  Attempting to calm the mood, Clair alleges that he queried, "will you cancel our services merely because we are asking valid questions we are concerned about.  You're the Chaplain and our concerns are chapel related? Who else are we suppose to address our questions to in this matter?"  (Doc. 1 at 18).  At this point, Lambert-Goheen allegedly yelled "everybody out" and began snatching up prayer rugs.  Clair overheard an Al-Islam inmate worker speaking loudly with Lambert-Goheen who immediately directed him to lower his voice.  Upon observing this interaction, Clair muttered to another inmate that they should file a grievance.  Lambert-Goheen said, "right!"  (Doc. 1 at 19).

Following the chapel incident, Plaintiff Clair and others returned to their cells without further issues, but by that evening (or over the course of the weekend) inmates including Clair and the co-plaintiffs were taken to restrictive housing.  They were not

provided with investigative reports.  At some point, a restrictive housing staff member suggested that they had been taken to segregation for threatening grievance activity against the Chaplain, but Clair dismissed this theory as implausible given that grievance activity is permissible.  On January 24, 2023, Plaintiff Clair and co-plaintiffs Bailey and Wilson were transferred from Shawnee (medium security) to Menard (maximum security).  At Menard they received disciplinary reports that were verbatim identical save for their names.  The reports alleged that confidential informants identified them as individuals who created a disturbance in the chapel by disrupting services and encouraging others to engage in disruptive behavior.  (Doc. 1 at 47).

At this preliminary juncture, this series of assertions is sufficient to suggest a retaliatory transfer claim.  Inmates do not have a protected interest in placement at any particular prison, however, when they allege that a transfer was done for an improper retaliatory reason, then they may have a claim.  *See e.g.*, *Holleman v. Zatecky*, 951 F.3d 873, 876-78 (7th Cir. 2020).  Here, it will be a close call whether the plaintiffs engaged in protected activity.  They are correct to argue that grievance and litigation activity is generally protected, however, in this instance the actual trigger for the alleged retaliation was a *discussion* about grievance activity, rather than the actual act of filing grievances.  They contend this all arose in the context of a civil conversation with Lambert-Goheen, but if it comes to light that they were actually engaging in backtalk or arguing with Lambert-Goheen, then the speech would not be considered protected First Amendment activity and their claims would fail.  *See e.g. Kervin v. Barnes*, 787 F.3d 833, 835 (7th Cir. 2015) ("backtalk by prison inmates to guards, like other speech that violates prison

discipline, is not constitutionally protected."); *Whitfield v. Spiller*, 76 F.4th 698, 708 (7th Cir. 2023) (an inmate's speech is not protected if it is disruptive and confrontational).

The question then arises, which defendants might be held liable for the alleged retaliatory transfer.  Plaintiff seems to allege that Defendants Galloway and Jeffreys coordinated the transfer or had to approve the transfer.  He does not explicitly associate the transfer with any other defendants mentioned in Claim 4.  Thus, Claim 4 may proceed on a theory of retaliatory transfer against Defendants Jeffreys and Galloway.

**Claim 5**

In addition to the above-discussed retaliatory transfer, the Plaintiffs fault Defendants Lambert-Goheen, C/O Harmon (the officer who reported the alleged disciplinary infraction), and John Doe 2 (the supervisor who allegedly signed off on the disciplinary report) for ultimately allowing or causing the issuance of the disciplinary report without an adequate investigation and as a contrived way to obscure Lambert-Goheen's behavior on January 20, 2023.  The Court characterizes this as an allegation of retaliatory discipline.  The Seventh Circuit acknowledged in *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) that a retaliatory discipline claim might be made against a prison employee who issues a disciplinary ticket or places an inmate in segregation even if these are penological decisions that do not independently trigger due process protections.  The *Whitfield* Court indicated that a retaliatory discipline claim should have proceeded beyond summary judgment against a prison employee who issued a disciplinary ticket and placed an inmate in segregation on the eve of his release when he refused to sign a pre-release document, because the record did not show the inmate was disruptive or

hostile, and there was insufficient evidence to show if the prison employee had a legitimate reason for the actions taken.  By contrast, in *Harris v. Walls*, 604 Fed. App'x 518 (7th Cir. 2015) the Seventh Circuit affirmed the dismissal of a retaliatory discipline claim at summary judgment where an inmate alleged he was disciplined for filing grievances and helping others to file grievances, because the prison staff involved in the discipline credibly established that they had a legitimate basis to discipline him for violation.  "A prisoner who has evidence that officials were motivated to discipline the prisoner because of protected speech cannot prevail if the officials show, without contradiction, that they would have disciplined him anyway for a legitimate reason." *Harris*, 604 Fed. App'x at 521.

As with *Harris*, the Plaintiffs' retaliatory discipline claim will turn on an intensive factual analysis of the circumstances surrounding the Plaintiffs' speech and the Defendants' decision to inflict discipline.  For now, the claim may proceed against Defendants Lambert-Goheen, C/O Harmon, and John Doe 2 (supervisor who allegedly signed the January 23, 2024, disciplinary reports.  By contrast, Plaintiffs also named Defendants Hillie and Bradford in association with the discipline, but they made no mention of what these individuals personally did in furtherance of the discipline, so Claim 5 against them will be dismissed without prejudice.

**Claim 6**

The Plaintiffs fault Defendants Wills, Schoenbeck and Jones (all Menard officials) for violating their right to Due Process via their handling of the disciplinary proceedings surrounding the January 20, 2023, chapel incident.  They attack the specificity of the

disciplinary reports (all three were verbatim identical), the use of the confidential sources, and the thoroughness of the investigation, among other things. Only Clair has personally described his interactions before the disciplinary committee, and he is the only one who has provided his Adjustment Committee Final Summary. However, the complaint states all three disciplinary hearings went similarly, and all three inmates were found guilty and were punished with one month of C-grade and 28 days in segregation. They argue generically that Menard is "atypical and significant" as a maximum-security facility, compared to the medium security environment at Shawnee. They point to the lack of amenities and programs, the amount of in-cell time, etc.. Although it is almost beyond doubt that Menard is less desirable that Shawnee, the Plaintiffs have not identified conditions of sufficient severity to persuade the Court that their very short 28-day stay in segregation was such an atypical and significant hardship that it invoked a protected liberty interest.

To establish a due process claim related to disciplinary proceedings, an inmate must demonstrate: (1) the deprivation of a liberty interest; and (2) the procedures he was afforded were constitutionally deficient. *Lisle v. Welborn*, 933 F.3d 705, 720 (7th Cir. 2019). Six months in segregation and six months' loss or restriction of privileges—do not, without more, implicate a protected liberty interest. *See Hardaway v. Meyerhoff*, 734 F.3d 740, 744 (7th Cir. 2013) (six-month disciplinary segregation alone); *Lekas v. Briley*, 405 F.3d 602, 605, 613 (7th Cir. 2005) (temporary loss of contact visitation and restricted commissary); *Whitford v. Boglino*, 63 F.3d 527, 533 n.7 (7th Cir. 1995) (six-month disciplinary segregation and demotion to C grade). A plaintiff may also argue that the

combination of disciplinary measures deprived him of a protected liberty interest.  *See Kervin v. Barnes*, 787 F.3d 833, 836 (7th Cir. 2015).  There is no bright-line rule for the duration or conditions of segregation that might invoke a protected liberty interest, but generally a term of segregation approaching or exceeding a year may be considered significant enough to invoke due process protections.  *See e.g., Marion v. Columbia Correction Inst.*, 559 F.3d 693, 698 (7th Cir. 2009) (finding that a term of 240-days of segregation was long enough to mandate an inquiry into the conditions of the confinement).  However, the imposition of disciplinary segregation without "additional facts about the conditions of confinement, [does] not implicate a liberty interest." *Miller v. Maue*, 759 F. App'x 515, 516 (7th Cir. 2019).

Here, the Court finds that the assertions about the actual conditions in segregation are so non-descript that the Plaintiffs have not established a protected liberty interest implicated by their 28-day term of segregation.  Additionally, in a situation where an inmate complains of discipline such as segregation, or anything other than the loss of good-time credit, the disciplinary proceedings are subject to an informal due process inquiry.  Informal due process requires only that an inmate is provided (1) notice of the reasons for his placement in segregation, (2) and an opportunity to present his views in a written statement or hearing.  *Ealy v. Watson*, 109 F.4th 958, 965 (7th Cir. 2024).  For Mr. Clair, who provided the most detail about his disciplinary situation, it appears he was at least notified of the basis for his placement in segregation, and he had an opportunity to present his views at the Adjustment Committee hearing.  He describes the disciplinary process as unfolding similarly for Bailey and Wilson, so the analysis is the same for their

potential due process claim.  As such, the Court finds it appropriate to dismiss Claim 6 as insufficiently pled.

## Claim 7

The Plaintiffs allege that under Illinois law, public entities must pay any judgment assessed against the Defendants' if there is a judgment entered against them for actions within the scope of their employment.  Under the State Employee Indemnification Act, 5 ILCS 350/1, et seq., the State is obligated to indemnify "any State employee" in civil actions against the employee for "act[s] or omission[s] occurring within the scope of the employee's State employment" and the Attorney General is to appear on the employee's behalf. 5 ILCS 350/2(a) and (e)(ii).  However, the Illinois State Employee Indemnification Act does not expressly create a private cause of action and will take effect without Plaintiffs' making an explicit claim like this in their case.  Thus, Claim 7 is dismissed without prejudice.

## Claims 8-10

In Claims 8, 9 and 10, Plaintiff Clair individually alleges that upon transfer from Shawnee to Menard, he experienced cruel and unusual punishment via the use of handcuffs in a fashion that caused extreme pain and cut his wrists.  He names John Doe 3 (a transit lieutenant from Shawnee), Jones, and John Does 4-6 (individuals at Menard involved in the handcuffing issue).  He also faults Defendant Crane for refusing or delaying related medical care or a handcuff permit.  Although this claim has a loose connection to the others, it involves entirely different legal standards and entirely separate defendants.  These claims are also legally more straightforward than Claims 1-7

and are likely to proceed much more quickly if severed into a distinct lawsuit. Therefore, the Court will sever Claims 8-10 into a lawsuit only against Defendants John Doe 3, Sergeant Jones, Crane, and John Does 4-6. Plaintiff Clair will have the option to proceed with this case, which will involve the payment of a new $405 filing fee, or he may opt to instead dismiss the case.

### Joinder of the Co-Plaintiffs

Upon receipt of this case, the Court immediately warned the co-plaintiffs of the challenges and risks of proceeding jointly in litigation as unrepresented individuals. Although all three plaintiffs affirmatively responded that they would like to proceed jointly, the Court now finds it impracticable for them to proceed jointly for a few reasons. Although the Plaintiffs in this case satisfy the requirements for permissive joinder under Rule 20(a) of the Federal Rules of Civil Procedure, the Court has the discretion to sever a party at any time. *See* FED. R. CIV. P. 21. The Seventh Circuit has stated,

> "[T]his discretion allows a trial court to consider, in addition to the requirements of Rule 20, other relevant factors in a case in order to determine whether the permissive joinder of a party will comport with the principles of fundamental fairness."

*Chavez v. Ill. State Police,* 251 F. 3d 612, 632 (7th Cir. 2001) (internal quotations and citations omitted).

It is clear from the various motions and documents filed by Plaintiffs that allowing them to proceed jointly in this case will only create unnecessary "prejudice, expense or delay[.]" *Id.* (quoting CHARLES ALAN WRIGHT, ET AL., FEDERAL PRACTICE AND PROCEDURE § 1652 at 396 (2001)).

As non-attorneys proceeding *pro se,* Plaintiffs may not sign or file motions or pleadings on behalf of each other. Therefore, each Plaintiff must sign every filing affecting his claims. *See* FED. R. CIV. P. 11. While obtaining signatures at the beginning of the case may be relatively easy, as the case progresses it can become more difficult for incarcerated persons to proceed together in a single action. Inmates can be transferred to another facility or relocated within a facility at any time and without any notice. *See Sandin v. Conner,* 515 U.S. 472, 485 (1995). "When the plaintiffs are no longer housed together in the same unit, it may be impossible [to] obtain each other's signatures." *See Hunter v. Allen Cty. Jail,* No. 20-cv-412-WCL-SLC, 2020 WL 6874210, at *1 (N.D. Ind. Nov. 23, 2020).

Here, the Court noted at the outset that only Plaintiff Clair had signed the Complaint, and in addition to directing Wilson and Bailey to express their intention about this lawsuit, it also directed these two to file signed copies of the complaint. They expressed their desire to proceed, but did *not* transmit signed copies of the pleading. This is a precondition for them to proceed. Additionally, as Defendant Wilson has indicated, he has now been relocated to another facility. (Docs. 12, 13, 15). Given the speed of the U.S. Mail in recent months between prisons and the Court, there is significant doubt that the three co-Plaintiffs can now communicate effectively to sign pleadings together or to coordinate their litigation efforts.

The Court additionally notes that the claims in this case appear to be extremely fact intensive and might end up being dependent on very personalized scenarios. For example, each inmate will be required to establish their own use of the administrative remedy (grievance) process, but they have only submitted evidence about Plaintiff Clair's

use of this process.  The circumstances surrounding exhaustion may be entirely different for Wilson or Blake, and it may be easier for that preliminary issue to be resolved on an individual basis.  Additionally, the ultimate analysis for the retaliation claims may also be highly dependent on the characteristics of each inmate, their history with the Defendants, and their personal characteristics relative to transfer decisions.  As such, for now the Court finds it appropriate to sever each Plaintiff into his own case.  The Court may later jointly process the cases at some or all phases if it becomes apparent that there will be significant factual and legal overlap as the cases progress.

### Disposition

**IT IS HEREBY ORDERED THAT** the Clerk of Court shall create three new lawsuits as follows:

**Case 1:  Jordan Bailey v. Lambert-Goheen, et al.**

- The defendants shall be: Chaplain Lambert-Goheen, Warden Galloway, Rob Jeffreys, C/O Harmon, and John Doe 2

- The Clerk of Court is **DIRECTED** to docket in the new case: this Memorandum and Order; the Complaint (Doc. 1); Bailey's Motion to Supplement (Doc. 10); and Bailey's Motion to Proceed IFP (Doc. 11)


**Case 2: Blake Wilson v. Lambert-Goheen, et al.**

- The defendants shall be: Chaplain Lambert-Goheen, Warden Galloway, Rob Jeffreys, C/O Harmon, and John Doe 2

- The Clerk of Court is **DIRECTED** to docket in the new case: this Memorandum and Order; the Complaint (Doc. 1); Wilson's Response (Doc. 7), and his Notices (Docs. 12, 13, 14, 15).

**Case 3: Leon Clair v. Sergeant Jones, et al.**

- The defendants shall be: Sergeant Jones, Crane, and John/Jane Does 3-6

- The Clerk of Court is **DIRECTED** to docket in the new case: this Memorandum and Order; the Complaint (Doc. 1); and Plaintiff Clair's Motion to Proceed IFP (Doc. 2).

- Per this Memorandum and Order, Plaintiff Clair shall have a 30-day period to notify the Court of his desire to proceed with this lawsuit, and if he opts to proceed, the claims will then be subject to review under 28 U.S.C. § 1915A.

The Clerk shall then **TERMINATE** Plaintiffs Jordan Bailey and Blake Wilson from this action, and it shall administratively **TERMINATE** Defendant Bailey's pending Motions (Docs. 10, 11).

    **IT IS HEREBY ORDERED THAT Claims 1, 2, and 3** survive initial review against Lambert-Goheen; **Claim 4** may proceed against Defendants Galloway and Jeffreys; and **Claim 5** may proceed against Lambert-Goheen, C/O Harmon, and John Doe 2. The Clerk of Court shall also **ADD** the Warden of Shawnee to this lawsuit in official capacity only to assist with the identification of John Doe 2.

By contrast, Plaintiffs have failed to state a claim: in **Claim 1** against Defendant Galloway, in **Claim 3** against Defendants Galloway or John Doe 1, in **Claim 5** against Hillie or Bradford, in **Claim 6** against Defendants Wills, Schoenbeck, and Jones, and in **Claim 7** against all Defendants.  The Clerk of Court is **DIRECTED** to **TERMINATE** Defendants John Doe 1, Hillie, Bradford, Jones, Schoenbeck, Travis Bayler, Wills, and John Does 3-6 because there are no remaining claims in this case against these individuals.

The Clerk of Court is **DIRECTED** to prepare for Defendants Lambert-Goheen, Galloway, Jeffreys, Harmon, and Warden of Shawnee (official capacity to identify John Doe 2): (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons).  The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint (Doc. 1), and this Memorandum and Order to Defendants' place of employment as identified by Plaintiff.  If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on Defendant, and the Court will require Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

If a Defendant cannot be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address.  This information shall be used only for sending the forms as directed above or for formally effecting service.  Any documentation of the address shall be retained only by the Clerk.  Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendants are **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g). Pursuant to Administrative Order No. 244, Defendants need only respond to the issues stated in this Merits Review Order.

If judgment is rendered against the Plaintiffs, and the judgment includes the payment of costs under Section 1915, the Plaintiffs will be required to pay the full amount of the costs, regardless of whether their applications to proceed in forma pauperis were granted.  See 28 U.S.C. § 1915(f)(2)(A).

Plaintiffs are **ADVISED** that they are under a continuing obligation to inform the Clerk of Court and each opposing party of any address changes; the Court will not independently investigate their whereabouts.  This shall be done in writing and not later than 14 days after a transfer or other change of address occurs.  Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for failure to prosecute.  FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

Dated: March 17, 2025

_____
DAVID W. DUGAN
United States District Judge

**NOTICE TO PLAINTIFF**

The Court will take the necessary steps to notify the appropriate defendants of your lawsuit and serve them with a copy of your complaint. After service has been achieved, the defendants will enter their appearance and file an Answer to the complaint. It will likely take at least 60 days from the date of this Order to receive the defendants' Answers, but it is entirely possible that it will take 90 days or more. When all of the defendants have filed Answers, the Court will enter a Scheduling Order containing important information on deadlines, discovery, and procedures. Plaintiff is advised to wait until counsel has appeared for the defendants before filing any motions, to give the defendants notice and an opportunity to respond to those motions. Motions filed before defendants' counsel has filed an appearance will generally be denied as premature. Plaintiff need not submit any evidence to the Court at his time, unless otherwise directed by the Court.

The Court wishes to remind the Plaintiff that litigation is often viewed a series of hurdles that the Plaintiff must clear to get to another hurdle. Initial screening is such a hurdle, but it is a very low one for the Plaintiff to clear.  As noted above, surviving initial screening only requires the bare statement of a claim that, if proven, could entitle Plaintiff to some relief. At trial, he will need to prove by a preponderance of evidence that the facts alleged actually occurred and that those facts satisfy the legal requirements for recovery. Trial is the highest and most difficult of hurdles for any Plaintiff to clear.